**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JUSTIN BRUTOSKY, *et al.*, | Civil Action No. 20-13516 (SDW)(JRA) |
| Plaintiffs, | **OPINION** |
| v. | October 3, 2023 |
| DR. FREDERICK STINNER, D.C., *et al.*, | |
| Defendants. | |

**WIGENTON**, District Judge.

Before this Court are Defendant Doctor Frederick Stinner's ("Stinner") Motions to Exclude Expert Testimony (D.E. 41, 42) and Plaintiffs Justin Brutosky ("Justin") and Suzana Brutosky's ("Suzana," and together with Justin, "Plaintiffs") Motion for Partial Summary Judgment (D.E. 51) pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. § 1332. Venue is proper pursuant to 28 U.S.C. § 1391. This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Stinner's motion to exclude the testimony of Dr. Murthy is **DENIED**, Stinner's motion to exclude the testimony of Dr. Chesloff is **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**.

1

### I. BACKGROUND AND PROCEDURAL HISTORY[1]

This case arises from a stroke that was allegedly caused by a chiropractic adjustment. In February 2015, Justin was purportedly experiencing chronic back, neck, and head pain. (D.E. 1 ¶¶ 11–13.) To alleviate his ailments, he periodically sought treatment from Stinner, a chiropractor at Madison Avenue Chiropractic Center. (*Id.* ¶ 11–12.) From early 2015 until September 17, 2018, Stinner performed 39 chiropractic cervical manipulation procedures[2] on Justin. (SMF ¶¶ 1–2.) Although a cervical manipulation procedure is a non-invasive one, it is not without risks. (*Id.* ¶¶ 3–4.) Among other harm, chiropractic cervical manipulation can cause cervical artery dissection[3], which in turn can lead to stroke. (SMF ¶ 4.) According to Plaintiffs, that is what happened to Justin.

---

[1] Facts cited in this opinion are drawn from the Complaint (D.E. 1), Plaintiffs' statement of material facts in support of their motion for partial summary judgment (D.E. 51-1 at 6–9 ("SMF")), and the exhibits underlying the instant motions. Importantly, despite this Court's several admonitions to the parties to adhere to the Local Civil Rules ("Local Rules"), Stinner has failed to do so. Among other deficiencies, Stinner's brief in opposition to Plaintiffs' motion for partial summary judgment has failed to comply with Local Rule 56.1, which provides:

> The opponent of summary judgment shall furnish, with its opposition papers, a responsive statement of material facts, addressing each paragraph of the movant's statement [of material facts], indicating agreement or disagreement and, if not agreed, stating each material fact in dispute and citing to the affidavits and other documents submitted in connection with the motion; any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion. In addition, the opponent may also furnish a supplemental statement of disputed material facts, in separately numbered paragraphs citing to the affidavits and other documents submitted in connection with the motion, if necessary to substantiate the factual basis for opposition . . . . Each statement of material facts shall be a separate document (not part of a brief) and shall not contain legal argument or conclusions of law.

L. Civ. R. 56.1(a). Stinner has not filed any statement in response to Plaintiffs' SMF and, consequently, the facts presented therein are deemed undisputed for the purpose of summary judgment.

[2] A chiropractic cervical manipulation "is a broad term that encompasses cervical spine manipulation by any healthcare professional and includes cervical adjustments by chiropractors." (D.E. 51-12 at 4.) It is often referred to as "spinal manipulative therapy," which "is a therapeutic intervention in which a high- or low-velocity, low-amplitude thrust is applied to the spine." (*Id.*)

[3] Generally, cervical artery dissection is a "[d]issection (tearing) of cervical (neck) arteries." (D.E. 51-8 at 5.)

On September 17, 2018, Stinner performed a chiropractic cervical manipulation procedure on Justin. (*Id.* ¶ 2.) Within weeks of that procedure, Justin, who at the time was 37 years old, suffered an embolic stroke as a result of a cervical artery dissection in his neck—at the same location on his body where Stinner performed the chiropractic cervical manipulation on September 17, 2018. (*Id.* ¶¶ 3, 11–12.) At the time of the September 17, 2018 procedure, Stinner knew that Justin had a family history of stroke, but he was not aware that a chiropractic cervical manipulation could cause cervical artery dissection and, in turn, stroke. (*Id.* ¶¶ 7–8.) Accordingly, Stinner never informed Justin of the risk thereof, nor suggested any alternative treatments. (*Id.* ¶¶ 9–10.)

On September 29, 2020, Plaintiffs filed the Complaint in this Court. (D.E. 1.) Therein, Justin asserted claims of professional negligence against Stinner (Count I) and vicarious liability against Madison Avenue Chiropractic Group P.C. (Count II). Suzana, Justin's wife, brought a claim for loss of consortium against all Defendants (Count III). (*See generally id.*) On November 9, 2020, Defendants filed an answer to the Complaint. (D.E. 4.) Following extensive discovery, the parties filed the instant motions (D.E. 41, 42, 51) and eventually completed briefing (D.E. 45–46; D.E. 52–54; D.E. 56–57).

This Court first addresses Defendants' motions to bar the testimony of Plaintiffs' expert witnesses before turning to Plaintiffs' motion for partial summary judgment.

## II.     STINNER'S MOTIONS TO BAR EXPERT TESTIMONY

### A. Legal Standard

Where a party moves to prohibit expert testimony, the reviewing court must ascertain whether the testimony is admissible as to those aspects under Federal Rule of Evidence ("FRE") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *In re Blood*

3

*Reagents Antitrust Litig.*, 783 F.3d 183, 187–88 (3d Cir. 2015). FRE 702 provides the following parameters for admissible expert testimony:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding whether to admit expert testimony, the trial court acts as a "gatekeeper" tasked with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999) (applying *Daubert* standard to all expert testimony). The court must consider whether: (1) the expert is qualified; (2) the expert's testimony is reliable; and (3) the expert's testimony is helpful to the trier of fact, *i.e.*, it must "fit" the facts of the case. *See United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008)). The proponent of the expert testimony must prove these requirements by a preponderance of the evidence. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145 (citing *In re Paoli R.R. Yard PCB Litig.* (*Paoli II*), 35 F.3d 717, 744 (3d Cir. 1994)).

**B. Discussion**

Stinner moves to prohibit testimony from two of Plaintiffs' experts, Doctors Santosh B. Murthy (D.E. 41) and Eric Chesloff (D.E. 42). This Court will address each motion in turn.

1. <u>Dr. Santosh B. Murthy</u>

Stinner contends that Dr. Murthy, a board-certified neurologist, is not a chiropractor and, thus, his testimony must be excluded under New Jersey's Medical Care Access and Responsibility

4

and Patients First Act ("Patients First Act"). Stinner's reliance on the Patients First Act is misplaced.

"The Patients First Act, passed by the [New Jersey] Legislature in 2004, is a collection of laws that was intended to reform [New Jersey's] tort-liability and health-care systems." *Nicholas v. Mynster*, 64 A.3d 536, 545 (N.J. 2013). Among other things, the Patients First Act "provides that an expert must have the same type of practice and possess the same credentials, as applicable, as the defendant health care provider, unless waived by the court." *Id.* at 546. That same-specialty rule, however, only applies "[i]f the party against whom or on whose behalf the testimony is offered is a specialist or subspecialist recognized by the American Board of Medical Specialties or the American Osteopathic Association and the care or treatment at issue involves that [same] specialty or subspecialty." N.J. Stat. Ann. 2A:53A-41(a). Stinner has failed to show that he—a chiropractor—falls within the category of medical practitioners covered by the Patients First Act. Indeed, neither the American Board of Medical Specialties nor the American Osteopathic Association recognizes a chiropractic specialty or subspecialty. *See Specialty and Subspecialty Certificates*, American Board of Medical Specialties, www.ambs.org/member-boards/specialty-subspecialty-certificates/ (last visited Sept. 27, 2023); *Specialties and Subspecialties*, AOA Board Certification, www.certification.osteopathic.org/specialties-and-subspecialties/ (last visited Sept. 27, 2023). Stinner raises no further arguments in support of his motion to bar Dr. Murthy's testimony and, accordingly, the motion will be denied.

2. Dr. Eric Chesloff

Stinner raises several arguments to contest the admissibility of Dr. Chesloff's testimony. Specifically, Stinner contends that Dr. Chesloff: improperly based his conclusions on the findings of other experts; was unable to testify specifically about the procedure on September 17, 2018;

5

and failed to "give the way and wherefore of his . . . opinion rather than a mere conclusion," in violation of New Jersey's net opinion rule. (D.E. 42 at 5–6.) Because Stinner does not dispute that Dr. Chesloff is qualified[4], this Court need only analyze the reliability and fit of Dr. Chesloff's testimony.

    a. Reliability

District courts must determine whether "the expert's opinion [was] based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Paoli II*, 35 F.3d at 742 (quoting *Daubert*, 509 U.S. at 590). To decide whether proposed expert testimony is reliable, a court may examine the following eight factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id.* at 742 n.8 (citing *Daubert*, 509 U.S. at 591; *United States v. Downing*, 753 F.2d 1224, 1238–39 (3d Cir. 1985)). Rule 702's inquiry into reliability is "a flexible one," however; and those eight factors are "neither exclusive nor dispositive." *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 595 (D.N.J. 2002), *aff'd*, 69 F. App'x 356 (3d Cir. 2003) (quoting *Daubert*,

---

[4] To be qualified as an expert, FRE 702 requires a witness to have "'specialized knowledge' regarding the area of testimony. The basis of this specialized knowledge 'can be practical experience as well as academic training and credentials.'" *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *Am. Tech. Res. v. United States*, 893 F.2d 651, 656 (3d Cir. 1990)). The Third Circuit has "stress[ed] that ordinarily an otherwise qualified witness is not disqualified merely because of a lack of academic training." *Id.* at 626. Furthermore, the specialized knowledge requirement is to be interpreted liberally and, accordingly, "a broad range of knowledge, skills, and training qualify an expert as such." *Paoli II*, 35 F.3d at 742 n.8 (citing *In re Paoli R.R. Yard PCB Litig. (Paoli I)*, 916 F.2d 829, 855 (3d Cir. 1990), *cert. denied*, 499 U.S. 961 (1991)).

509 U.S. at 594–95); *see also Kumho Tire Co.*, 526 U.S. at 150 ("[The *Daubert* factors] may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of the testimony."). Importantly, reliability may focus entirely or primarily on an expert's personal knowledge, experience, and expertise. *Kumho Tire Co.*, 526 U.S. at 150 ("In other cases, the relevant reliability concerns may focus upon personal knowledge or experience."); *Oddi*, 234 F.3d at 158 ("[T]here may be some circumstances where one's training and experience will provide an adequate foundation to admit an opinion and furnish the necessary reliability to allow a jury to consider it . . . ."). In such circumstances, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702, Advisory Committee Notes (2000 Amendments).

The burden of proving that an expert's testimony is reliable "is lower than the merits standard of correctness"—the grounds upon which the expert bases his or her opinion "merely have to be good, they do not have to be perfect." *Paoli II*, 35 F.3d at 744. Once a district court determines that an expert's testimony "rests upon good grounds," the validity thereof "should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quoting *Ruiz-Troche v. Pepsi Cola Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998)).

Here, this Court finds that Dr. Chesloff's testimony is reliable. Dr. Chesloff has been a practicing chiropractor for nearly 40 years. (D.E. 42-1 at 1.) During his career, he has reviewed literature related to the risks of chiropractic manipulation; he has conducted thousands—perhaps hundreds of thousands—of chiropractic adjustments, like the one Stinner performed on Justin; and

he has never caused a patient to suffer from vertebral dissection. (*See generally* D.E. 46-5.) In reviewing the facts of this case, Dr. Chesloff examined pleadings, depositions, interrogatories, photographs, various medical records, and other documents. (D.E. 42-1 at 2–3.) In turn, relying on his experience and knowledge, Dr. Chesloff drafted a report in which he opined: that "the standard chiropractic mechanical manipulative procedure[] is widely recognized throughout the health care industry as highly unlikely to cause vascular deficit"; that applying excessive force during a chiropractic manipulation increases the risk of harm, including arterial dissection, to patients; and that, if doctors attributed Justin's vertebral dissection to the September 17, 2018 chiropractic manipulation, it is highly likely that said manipulation "was done in a manner below the acceptable standard of chiropractic care, by using excessive for in manipulation . . . ." (*Id.* at 2–5.)

Stinner seeks to exclude as unreliable this testimony, but he has failed to identify any basis for doing so. Stinner's argument that Dr. Chesloff improperly relied on the opinions of other medical practitioners is unfounded. Stinner cites no case law, and this Court is not aware of any such precedent, that stands for the proposition that an expert cannot rely in part on the opinions of other experts and medical practitioners. Indeed, courts in this District routinely hold that experts may consult "a mix of objective data and subjective analysis from another expert to . . . create an admissible report." *Leese v. Lockheed Martin Corp.*, 6 F. Supp. 3d 546, 553 (D.N.J. 2014) (quoting *I.B.E.W. Loc. Union 380 Pension Fund v. Buck Consultants*, No. 03-4932, 2008 WL 2265269, at *3 (E.D. Pa. June 3, 2008)); *Edmond v. Plainfield Bd. of Educ.*, No. 11-2805, 2018 WL 4380991, at *5 (D.N.J. Sept. 13, 2018) ("[I]t is well settled that one expert may rely upon another expert's opinion in formulating his own."). Furthermore, Dr. Chesloff's lack of "knowledge regarding the underlying facts go[es] to the weight accorded to [his] report and testimony, rather than its

8

admissibility." *Leese*, 6 F. Supp. 3d at 553 (quoting *Buck Consultants*, 2008 WL 2265269, at *3). Cross-examination at trial—rather than exclusion at this stage—is the appropriate means by which Stinner can challenge any purported unreliability in Dr. Chesloff's testimony.

### b. Fit

To satisfy the helpfulness or "fit" requirement, the expert testimony must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591 (quoting *Downing*, 753 F.2d at 1242). Whether the analysis fits with the case "depends in part on 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Paoli II*, 35 F.3d at 743 (quoting *Downing*, 753 F.2d at 1237).

Stinner contends that Dr. Chesloff's testimony must be excluded because it fails to comply with New Jersey's net opinion rule. (D.E. 42-1 at 2–3.) In other words, Stinner argues that Dr. Chesloff failed to provide facts and data to support his conclusions. (*Id.*) As an initial matter, "the 'net opinion' rule is neither an evidentiary rule under the [FRE] nor a factor in the *Daubert* analysis. Instead, [it] is merely a restatement of the well-settled principle that an expert's bare conclusions are not admissible under" FRE 702's fit requirement. *Holman Enters. v. Fidelity & Guar. Ins. Co.*, 563 F. Supp. 2d 467, 472 n.12 (D.N.J. 2008) (second alteration in original) (citations omitted); *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 145–46 (1997) ("[N]othing in either *Daubert* or the [FRE] requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the date and the opinion proffered."). Accordingly, irrespective of whether this Court conducts an independent net opinion analysis or analyzes the issue under *Daubert*, "the inquiry remains the same—whether the expert's opinion will assist the trier of fact."

9

*Faragalla v. Otundo*, 626 F. Supp. 3d 783, 787 (D.N.J. 2022) (quoting *Iudici v. Camisa*, No. 12-3466, 2022 WL 3998295, at *3 (D.N.J. Sept. 1, 2022)).

Here, Dr. Chesloff's testimony will help the jury to understand: (a) the chiropractic standard of care; (b) that failure to comply therewith can result in harm, including arterial dissection and stroke; and (c) that, in this case, Stinner likely deviated from the standard of care by using excessive force. Testimony by a chiropractor regarding the chiropractic standard of care undoubtedly fits the facts of this case and, thus, is permissible. However, to the extent Dr. Chesloff wishes to testify that Stinner's September 17, 2018 cervical manipulation, in fact, violated the standard of care and caused Justin's arterial dissection and stroke, those conclusions are impermissible. While experts may testify to causation, *see, e.g.*, *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 154 – 59 (3d Cir. 1999) (holding that medical experts may reach conclusions regarding causation, however, district courts may exclude expert testimony that does "not reliably flow from th[e] data and methodology"), "there is simply too great an analytical gap between" Stinner's cervical manipulation on September 17, 2018, and Dr. Chesloff's conclusions about Stinner's deviating from the standard of care and causing Justin's stroke, *Joiner*, 522 U.S. at 145–46. Those conclusions are supported only by Dr. Chesloff's *ipse dixit* rather than the underlying facts. (*See generally* D.E. 42-1.) Indeed, his report largely attributes these conclusions to his own unawareness of any other "medical predisposition that [Justin] may have had for cervical artery dissection and stroke." (*Id.* at 5.)

In sum, this Court will permit Dr. Chesloff's testimony regarding (a) the chiropractic standard of care, (b) the consequences of failing to comply therewith, and (c) the likelihood that Stinner deviated from the standard of care; however, Dr. Chesloff's testimony that Stinner in fact violated the standard of care on September 17, 2018, and caused Justin's stroke is inadmissible.

Stinner's motion to bar the testimony of Dr. Chesloff will accordingly be granted in part and denied in part.[5]

Having ruled on Stinner's motions to bar expert testimony, this Court now turns to Plaintiffs' motion for partial summary judgment.

### III.    PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

#### A. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original).  A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party meets this initial burden, the burden then shifts to the nonmovant who "must set forth specific facts showing that there is a genuine issue for trial." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–

---

[5] To the extent Stinner moves for summary judgment, that motion is dismissed for failure to comply with the relevant Local Rules.  L. Civ. R. 56.1.

11

89 (3d Cir. 2018) (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)) The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. In considering a motion for summary judgment, this Court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 572 U.S. 650, 651, 656–57 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255).

Although Stinner has failed to dispute Plaintiffs' SMF—thus rendering undisputed the material facts therein—that "is not alone a sufficient basis for the entry of a summary judgment." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir. 1990). This Court still "must determine that the facts specified in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assocs.*, 922 F.2d at 175.

### B. Discussion

To prevail on a claim for negligence based on a lack of informed consent, a plaintiff must establish four elements: "(1) the physician failed to comply with the [reasonably-prudent-patient] standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries." *Howard v. Univ. Med. & Dentistry of N.J.*, 800 A.2d 73,

79 (N.J. 2002) (alteration in original) (quoting *Teilhaber v. Greene.*, 727 A.2d 518, 524 (N.J. Super. Ct. App. Div. 1999)).  Here, it is unclear whether Plaintiffs have moved for summary judgment on all four elements of their claim for negligence based on a lack of informed consent.  This Court finds that summary judgment is warranted as to the first element, but it must be denied as to the remaining elements.

1. <u>Disclosure</u>

In New Jersey, "[i]nformed consent is a negligence concept predicated on the duty of a physician to disclose to a patient information that will enable him to 'evaluate knowledgeably the options available and the risks attendant upon each' before subjecting that patient to a course of treatment." *Perna v. Pirozzi*, 457 A.2d 431, 438 (N.J. 1983) (quoting *Canterbury v. Spence*, 464 F.3d 772, 780 (D.C. Cir. 1972)).  The Supreme Court of New Jersey has adopted the "prudent patient" standard to determine when disclosure is required.  *Howard*, 800 A.2d at 79 (citing *Largey v. Rothman*, 540 A.2d 504, 510 (N.J. 1988)).  Accordingly, a plaintiff "must prove that the [defendant-physician] withheld pertinent medical information concerning the risks of the procedure or treatment, the alternatives, or the potential results if the procedure or treatment were not undertaken," and that a "reasonably prudent patient would deem [those undisclosed risks] significant in determining whether to proceed with the proposed procedure." *Id.*

Here, the undisputed facts establish that:  chiropractic cervical manipulation has a known risk of cervical arterial dissection and, in turn, stroke; experts and medical journals suggest Justin had a family history of stroke of which Stinner was aware; Stinner never disclosed to Justin a risk of cervical arterial dissection or stroke; and Stinner never disclosed or offered any alternative treatment.  In sum, Stinner failed to apprise Justin of risks that a reasonably prudent patient would

13

deem significant in determining whether to proceed with the procedure.[6] Consequently, Justin's motion for summary judgment will be granted as to the first element.

### 2. The Remaining Elements

It is unclear whether Plaintiffs have moved for summary judgment on the second, third, and fourth elements of their claim for negligence premised on a lack of informed consent. While Plaintiffs extensively address—in briefing and in their SMF—the first element of the claim, they make only passing and conclusory references to the latter three elements. In any event, issues of material fact remain with respect to the remaining elements[7], and therefore, Plaintiffs' motion for summary judgment as to those elements must be denied.

## IV. CONCLUSION

For the reasons set forth above, Stinner's motion to exclude the testimony of Dr. Murthy is **DENIED**, Stinner's motion to exclude the testimony of Dr. Chesloff is **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' motion for partial summary judgment is **GRANTED IN PART AND DENIED IN PART**. An appropriate order follows.

---

[6] Stinner insists that reasonableness is generally a fact-intensive question that must be left to a jury to decide. *See, e.g.*, *Jugan v. Econ. Premier Assur. Co.*, 728 F. App'x 86, 91–92 (3d Cir. 2018). Construing all of the undisputed facts in the light most favorable to Stinner, however, this Court finds that a reasonably prudent patient in Justin's position—*i.e.*, a patient with an undisputed family history of stroke undergoing a procedure with an undisputed, material risk of stroke—would deem significant such a risk in determining whether to proceed with the proposed procedure.

[7] As stated earlier in this Opinion, to prevail on a claim for medical negligence based on a lack of informed consent, a plaintiff must establish that: "(1) the physician failed to comply with the [reasonably-prudent-patient] standard for disclosure; (2) the undisclosed risk occurred and harmed the plaintiff; (3) a reasonable person under the circumstances would not have consented and submitted to the operation or surgical procedure had he or she been so informed; and (4) the operation or surgical procedure was a proximate cause of plaintiff's injuries." *Howard*, 800 A.2d at 79 (alteration in original) (quoting *Teilhaber*, 727 A.2d at 524). Issues of material fact remain with respect to the latter three elements. To be sure, the second element requires Plaintiffs to prove that Justin's harm—*i.e.*, his arterial dissection and subsequent stroke—was caused by the September 17, 2018 chiropractic adjustment. To establish causation, Plaintiffs rely heavily upon expert testimony. Causation, however, is a quintessential jury question, *Highlands Ins. Co. v. Hobbs Grp., LLC*, 373 F.3d 347, 356 (3d Cir. 2004) ("[Q]uestions of negligence . . . and causation are within the jury's province in all but the most exceptional situations." (citations omitted)), and "the credibility and weight of that [expert] testimony is to be determined by the jury, not the trial judge." *Breidor v. Sears, Roebuck & co.*, 722 F.2d 1134, 1138–39 (3d Cir. 1983). In addition, Plaintiffs offer no facts—undisputed or otherwise—with respect to the third and fourth elements.

                                                                  /s/ Susan D. Wigenton  
                                                         **SUSAN D. WIGENTON, U.S.D.J.**

Orig:   Clerk  
cc:     Parties  
        Jose R. Almonte, U.S.M.J.